**MICRO DATA BASE SYSTEMS, INC., Plaintiff–Appellant, Cross–Appellee,**

v.

**DHARMA SYSTEMS, INC., Defendant– Appellee, Cross–Appellant.**

Nos. 97–2989, 97–3138.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1998.

Decided May 29, 1998.

William P. Kealey (argued), Stuart & Branigin, Lafayette, IN, for Micro Data Base Systems, Inc. in No. 97-2989.

William P. Kealey (argued), Susan K. Roberts, Stuart & Branigin, Lafayette, IN, for Micro Data Base Systems, Inc. in No. 97-3138.

Sean M. Clapp (argued), Bradley C. Morris, Johnson, Smith, Pence, Densborn, Wright & Heath, Indianapolis, IN, Joseph A. Foster, McLane, Graf, Raulerson & Middleton, Manchester, NH, for Defendant–Appellee, Cross–Appellant.

Before POSNER, Chief Judge, and CUMMINGS and KANNE, Circuit Judges.

POSNER, Chief Judge.

We have before us an appeal and a cross-appeal in a diversity suit that presents issues of contract law, trade secrets law, and conflict of laws. The underlying dispute between the parties, two software companies that we'll call MDBS and Dharma, arises out of a four-way deal. The Internal Revenue Service requested bids for a contract to improve the Service's computer capabilities. Unisys Government Systems, Inc. wanted to bid on this contract. It made a contract with MDBS for the provision of a workstation database management system designed to be used by the IRS. MDBS in turn made the contract with Dharma that is in issue in this suit. In the contract, Dharma agreed to adapt its proprietary software program known as SQL Access for use in the system that MDBS would be providing to Unisys for sale to the IRS. MDBS agreed to pay a license fee of $125,000 for use of the SQL Access program plus $125,000 for Dharma's adapting the program to MDBS's needs. The license fee was to be paid immediately. The second $125,000, which is denominated "for professional services," was to be paid in three installments. The first installment, $50,000, was due upon "Project Start-up." The second installment, also $50,000, was due upon "Beta Release," that is, when the modified SQL Access program was sent to MDBS and Unisys for "beta testing." This is a term of art in the computer industry; but in the case of custom software (our case) as distinct from commercial software, the record is unclear whether it is the penultimate or ultimate performance test before the customer's acceptance of delivery of the software. The last installment, $25,000, was due upon "Acceptance by Unisys."

The contract terms that we have just summarized are the terms as stated in a letter that MDBS wrote Dharma on July 7, 1994. They are not completely congruent with the terms set forth in a letter that Dharma had written MDBS the previous month. That letter had included a term calling for MDBS to pay Dharma a royalty on each sale of the MDBS program in which the SQL Access program (called "RDMS Emulation" in its adapted form—"RDMS" standing for "Relational Database Management System") was incorporated. The royalty was to be equal to 25 percent of the price that MDBS charged Unisys for each RDMS Emulation. MDBS's

letter of July 7 makes no reference to a royalty. In between the two letters, however, Dharma had sent MDBS a draft of a License Agreement designed to limit the distribution of the RDMS Emulation, and the draft contained the royalty provision mentioned in Dharma's letter. MDBS never signed the agreement, but continually reassured an increasingly anxious Dharma (which made repeated requests) that it would do so.

MDBS paid Dharma the $125,000 license fee, and Dharma went to work. MDBS also paid both the first installment of the adaptation fee—$50,000 upon project start-up—and, on November 8, 1994, when Dharma shipped the beta version of the RDMS Emulation, the second $50,000 installment. MDBS turned the beta version over to Unisys for testing. Unisys did not report to either MDBS or Dharma any defects, though whether this is because Unisys tested the beta version and found no problems with it or didn't test it at all is not disclosed by the record. The following May, Unisys landed the contract with the IRS, and it then asked MDBS to send it six copies of the RDMS Emulation—one for it to keep and the others to sell to the IRS. The beta version of the RDMS Emulation had been on tape, and the IRS wanted it on disks, but Dharma refused to provide disks until MDBS signed the License Agreement. MDBS still refused to sign the agreement, but upon its written representation to Dharma that "it [MDBS] will not distribute this Component [that is, the RDMS Emulation] without [Dharma's] prior written consent," Dharma relented and shipped the disks to MDBS on September 20, 1995. Except for the change in the medium, the disks were identical to the tapes, that is, to the beta version which Unisys had received almost eleven months earlier.

A few weeks after this, MDBS, without seeking or obtaining Dharma's consent, shipped the six copies of the RDMS Emulation to Unisys. MDBS's cover letter stated that the shipment was for "acceptance testing," was not "a distribution," and was to be used for "quality assurance and further testing only," and "any further duplication or distribution is strictly prohibited." Two weeks later Unisys notified MDBS of ten

(later reduced to nine) defects in the RDMS Emulation. Presumably these defects were revealed by testing the disk version; so we shall assume, although it is conceivable that Unisys was belatedly reporting the results of tests that it had conducted months earlier on the beta version.

The defects apparently were minor and easy to correct. But Dharma refused to correct them until MDBS signed the License Agreement. Dharma was worried that once they were corrected, MDBS or Unisys could duplicate the disks and thus sell multiple copies to the Internal Revenue Service. It is true that Dharma's programs are copyrighted, so neither MDBS nor Unisys could lawfully have copied them. But Dharma was worried that MDBS or Unisys might be able through reverse engineering to extract non-copyrightable elements in the software from which it might be able to build a duplicate of the RDMS Emulation that would not infringe Dharma's copyright. See *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1546–48 (11th Cir.1996); *Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 706–11 (2d Cir. 1992); *Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526–28 (9th Cir.1992); *Atari Games Corp. v. Nintendo of America Inc.*, 975 F.2d 832, 843–44 (Fed.Cir.1992).

Despite the defects, Unisys turned over five of the six copies of the RDMS Emulation to the IRS, paid MDBS the $25,000 final installment for transmission to Dharma (which MDBS kept rather than remit to Dharma), and, pursuant to its contract with MDBS, paid MDBS $413,894 in prepaid royalties generated by Unisys's contract with the IRS. Unisys had been withholding this payment until it obtained the five copies of the RDMS Emulation which it needed to satisfy its contractual obligations to the IRS.

MDBS brought this suit against Dharma seeking restitution of the $225,000 that it had paid Dharma under the contract. Dharma counterclaimed, seeking $25,000 (the unpaid final installment under the contract) in damages for breach of contract and additional damages for misuse of the trade secrets embodied in the RDMS Emulation and the underlying SQL Access program. The district court ruled as a matter of law that the

substantive issues in the case were governed by the law of New Hampshire, that MDBS and not Dharma had violated the contract and owed Dharma $25,000 for this breach, and that MDBS had also violated Dharma's rights under trade secret law. A jury assessed compensatory damages for the trade secret violations in the amount of $76,867.50, the district court having ruled as a matter of law that MDBS was not liable for punitive damages.

■MDBS's business is in Indiana and Dharma's in New Hampshire. The contract was made by an exchange of letters and other communications, and so has no site. But the contract was performed entirely in New Hampshire, and we agree with the district court that under Indiana's choice of law rules, which are the rules applicable to this diversity case, the law applicable to both the contract and trade secrets issues is that of New Hampshire. The standards that state courts (including those of Indiana, see *Hartford Accident & Indemnity Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind.App.1997)) use nowadays, see *Restatement (Second) of Conflict of Laws* §§ 6, 188(2) (1971), to resolve choice of law issues are widely and we think correctly believed to be nondirective, but their administration is usually pretty sensible. The important thing, especially in a contractual setting, is that the parties should have a clear idea of which state's law will apply, *NL Industries, Inc. v. Commercial Union Ins. Co.*, 65 F.3d 314, 327 (3d Cir. 1995); *Restatement, supra,* § 188, comment b, since once they know this they can if they wish change the state whose law is to govern their relation by including a choice of law provision in their contract. In a case in which the contract is made as it were nowhere, because the parties are in different states (or countries) and the contract is negotiated without a face-to-face meeting, but it is entirely performed in one state, the parties will expect the law of that state to govern any contractual dispute that arises during performance (for what other state would be a more plausible candidate?) unless they specify otherwise in the contract, which they did not do here. So the district court's choice of law ruling was clearly correct with respect to the contract issues. *Dohm & Nelke v. Wil-*

*son Foods Corp.*, 531 N.E.2d 512, 514 (Ind. App.1988). We do not understand the parties to be arguing that MDBS's claim for restitution should be treated any differently from Dharma's breach of contract claim. They are right not to argue this. *Restatement, supra,* § 221, comment d; *see Gold v. Wolpert,* 876 F.2d 1327, 1331 (7th Cir.1989).

■ Since the parties' dispute over trade secrets (like the claim for restitution) grows out of the contract, and the trade secrets themselves were created in and are held in New Hampshire and it is there that the primary harm from their unlawful disclosure would be felt because that is where Dharma's business is located, we think it reasonably clear that New Hampshire law governs the trade secret issues as well. We can't find a case on point, but as with the choice of law issue involving the contract there is only one plausible candidate for the state whose law is to govern. It is true that the last act necessary to make MDBS's conduct tortious occurred in Virginia, where Unisys received the copies of the RDMS Emulation; until then Dharma's trade secret had not been taken out of authorized channels. And this means that the tort occurred in Virginia, *Hubbard Mfg. Co. v. Greeson,* 515 N.E.2d 1071, 1073 (Ind.1987), but that is the merest technicality and does not imply that Virginia law is the appropriate law to govern the trade secret issues. See *id.* at 1073–74. Virginia has no regulatory interest in the activity affected by the alleged tort.

■ The parties believe that choice of law has a twofold significance here. First, New Hampshire unlike most states does not recognize a common law right to seek punitive damages. Punitive damages may be awarded only if a statute authorizes their award. N.H. RSA § 507:16. But there is such a statute here—the Uniform Trade Secrets Act, which both New Hampshire and Indiana have adopted, and which authorizes punitive damages for the willful and malicious appropriation of a trade secret. *Id.,* § 350–B:3(II); IC 24–2–3–4(c). But the Act says nothing about standard of proof—whether only a preponderance of the evidence is required, or, as the district court ruled in turning down

Dharma's punitive damages claim, clear and convincing evidence. There are no cases from either Indiana or New Hampshire on the question, and the cases from other jurisdictions are split over it. See *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 666 (4th Cir.1993) (Maryland law) (clear and convincing); *Centrol, Inc. v. Morrow*, 489 N.W.2d 890, 896 (S.D.1992) (clear and convincing); *Zawels v. Edutronics, Inc.*, 520 N.W.2d 520, 523–24 (Minn.App.1994) (preponderance). It might seem that the New Hampshire courts would be likely, should the issue arise, to choose clear and convincing over preponderance because of the state's hostility to common law punitive damages. But the Indiana courts are at least as likely to do the same thing, given their general rule that punitive damages may be awarded only on the basis of clear and convincing evidence. E.g., *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 136 (Ind.1988). So we seem to have a false conflict.

■ In any event, the standard of proof doesn't matter here, for there is no basis for punitive damages under either standard. This is a garden-variety trade secret dispute rather than anything that smacks of willfulness or malice—vague terms but obviously implying some element of aggravation. Cf. *Superbird Farms, Inc. v. Perdue Farms, Inc.*, 970 F.2d 238, 251 (7th Cir.1992), overruled on other grounds by *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 106 F.3d 1388, 1397 (7th Cir.1997); *von Gonten v. Research Systems Corp.*, 739 F.2d 1264, 1268 (7th Cir.1984). The misappropriation of a trade secret is an intentional tort, but it is not the law that the fact that a tort is intentional automatically authorizes the award of punitive damages. See *Sufrin v. Hosier*, 128 F.3d 594, 598 (7th Cir.1997), and with specific reference to trade secrets *Sokol Crystal Products, Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1435 (7th Cir. 1994); *In re Innovative Construction Systems, Inc.*, 793 F.2d 875, 889 (7th Cir.1986). If it did, the Uniform Trade Secrets Act would not limit punitive damages to cases in which the violation of the Act is willful or malicious. When an award of punitive damages requires that the defendant have committed an aggravated form of the wrongful

act sought to be punished, a defendant who commits the barebones tort is not liable for such damages. *Sufrin v. Hosier, supra*, 128 F.3d at 598; *Anthony v. Security Pacific Financial Services, Inc.*, 75 F.3d 311, 316 (7th Cir.1996). Nothing more need be said, therefore, about the cross-appeal.

■ The second and greater significance of choice of law in this case is that the probability that the contract is governed by the Uniform Commercial Code is much greater under New Hampshire law than under Indiana law. Article 2, the relevant part of the Code, is limited to the sale of "goods." The only Indiana case holds that custom software is a service, *Data Processing Services, Inc. v. L.H. Smith Oil Corp.*, 492 N.E.2d 314, 317–19 (Ind.App.1986); see also *Micro–Managers, Inc. v. Gregory*, 147 Wis.2d 500, 434 N.W.2d 97, 100 (1988), while the only New Hampshire case holds that it is a good. *Colonial Life Ins. Co. v. Electronic Data Systems Corp.*, 817 F.Supp. 235, 238–39 (D.N.H.1993). A district judge's interpretation of state law is not entitled to deference by the court of appeals. *Salve Regina College v. Russell*, 499 U.S. 225, 238–39, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). But as *Colonial Life* is consistent with the weight of authority, see cases cited in 817 F.Supp. at 239; also *Comshare, Inc. v. United States*, 27 F.3d 1142, 1145 n. 2 (6th Cir.1994); *Advent Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 674–76 (3d Cir.1991), and reaches the right result—for we can think of no reason why the UCC is not suitable to govern disputes arising from the sale of custom software— we'll follow it.

■ That cannot be the end of the analysis, however. The contract between MDBS and Dharma was for the sale not only of a good (the RDMS Emulation), as we have just held, but also of a service—the creation of the RDMS Emulation by adaptation of Dharma's preexisting program, the SQL Access program. Under New Hampshire law, to determine whether such a "hybrid" transaction is governed by the Code requires deciding which aspect of the transaction, the sale of goods or the sale of services, predominates (unless, perhaps, the dispute is clearly

assignable to either the goods or the services aspect, and it is not here). *In re Trailer & Plumbing Supplies*, 133 N.H. 432, 578 A.2d 343, 344–45 (1990). Here it is the sale of the goods that predominates. See *Advent Systems Ltd. v. Unisys Corp., supra*, 925 F.2d at 675–76; *Communications Groups, Inc. v. Warner Communications, Inc.*, 138 Misc.2d 80, 527 N.Y.S.2d 341, 344 (N.Y.C.Civ.Ct. 1988). Although the contract recites that half the total contract price is for Dharma's "professional services," these were not services to be rendered to MDBS but merely the labor to be expended by Dharma in the "manufacture" of the "good" from existing software. It's no different than if MDBS were buying an automobile from Dharma, and Dharma invoiced MDBS $20,000 for the car and $1,000 for labor involved in customizing it for MDBS's special needs. It would still be the sale of a good within the meaning of the UCC. We doubt that it should even be called a "hybrid" sale, for this would imply that every sale of goods is actually a hybrid sale, since labor is a service and labor is an input into the manufacture of every good.

■ Having decided that New Hampshire law and the UCC govern, we turn at last to the substantive issues. The principal issue bearing on Dharma's claim of breach of contract is whether delivery of the RDMS Emulation was "accepted." For it was only upon acceptance that MDBS was contractually bound to pay Dharma the final installment of the contract price—the $25,000 that the district judge awarded Dharma as the damages for breach of contract. Ordinarily of course delivery is to the buyer under the contract, who either accepts or rejects. But there is nothing to prevent the buyer from delegating receipt and acceptance to another, *Midwest Precision Services, Inc. v. PTM Industries Corp.*, 887 F.2d 1128, 1134–35 (1st Cir.1989), in this case Unisys—which is what the parties did: the final installment was due upon "Acceptance [of the RDMS Emulation] by Unisys." MDBS contends, however, that Unisys rejected rather than accepted the RDMS Emulation, by refusing to signify acceptance and instead notifying Dharma and MDBS of defects in the software.

■ Under the UCC, goods are deemed accepted if the buyer (or, we think it clear though we cannot find any case, its delegate) fails, after having had a reasonable amount of time in which to inspect them, to communicate its rejection to the seller. UCC § 2–606(1)(b); *Van Dorn Co. v. Future Chemical & Oil Corp.*, 753 F.2d 565, 574 (7th Cir.1985). This is a commonsensical rule. The seller is entitled to know where he stands, so that he can cure any defects in the goods. In addition, the rule saves on paperwork by allowing silence to count as acceptance. And it also discourages buyers who after receiving the goods decide they don't want them after all from trying to get out of their contract by making phony claims of nonconforming tender, perhaps when it is too late to verify the claims.

■ Unisys received the beta version of the RDMS Emulation in November of 1994 and did not complain about the defects until eleven months later. Unisys neither needed nor was entitled to eleven months to inspect the beta version; the contract gave it only 20 days to inspect and to report back any defects that the inspection revealed. MDBS's argument is, rather, that Unisys needed a separate period of time in which to inspect the disk version, which it did not receive until shortly before it communicated the list of defects to Dharma. The two versions, the tape version (the beta version), and the disk version, were identical, and so it may seem odd for the parties to have given Unisys a chance to reject an identical version of a program that it had already had a chance to inspect. And while the final installment payment was not due until Unisys accepted the program, the apparent purpose was merely to take care of the situation in which the beta version, having been duly inspected, was found to contain defects that had to be corrected before Unisys could use it, and until correction Unisys didn't want to pay for it.

But the parties may have contemplated two rounds of testing, the first a once-over-lightly review to identify the obvious bugs which are so common in a new software program and the second a more searching review to enable the buyer to make sure that the program really works. Cf. *ProCD, Inc.*

*v. Zeidenberg,* 86 F.3d 1447, 1453 (7th Cir. 1996). We therefore are reluctant to say that as a matter of law Unisys's failure to report any defects as a result of the beta testing operated as acceptance of the final, disk version, binding MDBS to complete payment on the contract to Dharma. Until a definite trade usage emerges defining the relation between beta testing and acceptance testing of custom software, parties to contracts for the sale of such software would be well advised to define "beta testing" or "acceptance" in the contract. But this bit of advice will not help us resolve the present case, in which the absence of a definition leaves unclear whether the parties envisaged further testing after the beta testing.

This gap in the record would require a trial if all we had as evidence of acceptance were Unisys's silence after receipt of the beta version. But there is more. Despite the nine defects reported by Unisys, the RDMS Emulation worked well enough for Unisys to sell it to the Internal Revenue Service, which Unisys could not have done if it hadn't bought the software, and to pay MDBS the final installment of the price. This conduct shows both that the defects were not serious enough to permit rejection of the RDMS Emulation (every computer program has bugs) and that Unisys in fact accepted it. See UCC §§ 2–606(1)(a), (c); *Klockner, Inc. v. Federal Wire Mill Corp.,* 663 F.2d 1370, 1379 n. 3 (7th Cir.1981); *Sunkyong America, Inc. v. Beta Sound of Music Corp.,* 199 A.D.2d 100, 605 N.Y.S.2d 62 (App.Div.1993) (per curiam). Since there was acceptance, Dharma was entitled to the balance of the price of its contract with MDBS, the $25,000 that the district judge awarded it for a breach of contract.

■ But this assumes that Dharma did not break the contract by its initial refusal to turn over the disk version of the program to Unisys. It did not. Dharma had justifiable concerns about the loss of its trade secrets, and anyway it did eventually turn over the disks, after receiving written assurances from MDBS; and thus, in the end, it complied with its obligations; nor was MDBS harmed by the delay, which was slight. So MDBS has no basis for claiming the return of the $100,000 in installment payments that it made on the contract.

■ MDBS's claim for the return of the $125,000 license fee that it paid Dharma upon the signing of the contract is extracontractual. It is based on the rule that a person who breaks his contract may still be entitled to the restitution of the benefits that he conferred on the other party before the breach, once the victim of the breach has been fully compensated by an award of damages. UCC §§ 2–718(2), (3); *R.E. Davis Chemical Corp. v. Diasonics, Inc.,* 826 F.2d 678, 680 (7th Cir.1987); *Kutzin v. Pirnie,* 124 N.J. 500, 591 A.2d 932, 937–41 (1991); *Restatement (Second) of Contracts* § 374(1) (1981). An award not reduced by the benefit received by the plaintiff would be too large to be compensatory, and so it would be punitive, and punitive damages are rarely, and in New Hampshire never, awarded in contract cases; and so a victim of a breach of contract who wants to keep the contract breaker's money above and beyond the amount necessary to compensate for the breach may be said to be "unjustly enriched," entitling the contract breaker to restitution. See *Johnson v. Gudmundsson,* 35 F.3d 1104, 1114 (7th Cir.1994); *Commercial Associates v. Tilcon Gammino, Inc.,* 998 F.2d 1092, 1100 (1st Cir.1993). MDBS claims that it gave Dharma $125,000 for a license and got nothing in return. Remember that Dharma's position is that MDBS had no right to distribute copies of the RDMS Emulation until it signed the License Agreement, and without distribution (to Unisys, for transfer to the Internal Revenue Service) the "license" for which MDBS had paid $125,000 was worth exactly nothing.

There would be merit to this argument if MDBS had actually paid the $125,000—which it did not; it was merely the conduit for payment by Unisys to Dharma—*and* if MDBS had never distributed copies of the program to Unisys, which it did. It is true that the license fee presupposed the execution of an agreement that would enable MDBS to transfer the RDMS Emulation to Unisys so that MDBS could fulfill its contract with Unisys, which was the actual payor for the RDMS Emulation. Had Dharma refused to execute the agreement and as a

result prevented MDBS from transferring the RDMS Emulation to Unisys, it could not have pocketed the $125,000. But it did not refuse. And while it sent its own version of such an agreement to MDBS for signature, it did not do so on a take-it-or-leave-it basis, refusing to negotiate the terms. MDBS never signified any dissatisfaction with the terms. In any event, MDBS did transfer the RDMS Emulation to Unisys and received in exchange the substantial compensation that Unisys had promised. MDBS got what it would have gotten if it had paid for the license, and it should pay for it.

 We turn last to Dharma's trade secret claim. A trade secret is simply a piece of information the value of which to the creator of the information depends on its not being generally known. N.H. RSA § 350–B:1(IV)(a). It is not a property right in the sense that a patent is, for it is perfectly lawful for a competitor to buy a product embodying a trade secret and unmask the secret by reverse engineering. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 490, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 925 F.2d 174, 178 (7th Cir.1991). Only if the competitor (or anyone else for that matter) discovers the secret by breaking a contract or engaging in other unlawful or improper conduct can the individual or firm whose secret it was obtain a remedy. *Id.* at 178; *Pioneer Hi–Bred Int'l v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226, 1238–39 (8th Cir.1994).

 The significance of breach of contract in this connection is that a commercial secret rarely has value if it is known only to one person. Others must be let in on the secret and the remaining secrecy preserved by contracts forbidding disclosure to still others who might exploit it commercially to the harm of the secret holder. The RDMS Emulation could not be sold without giving the ultimate buyer, Unisys, a chance to inspect it. But Dharma wanted to make sure that this would not entitle Unisys to duplicate the program without paying Dharma. That is why it insisted that MDBS not transfer the final version of the program to Unisys without Dharma's prior written consent—to make

sure that the transfer was on conditions that prevented duplication. MDBS agreed, but violated the agreement, and as a result Unisys obtained the final version and turned it over to its customer, the Internal Revenue Service, without restrictions.

So Dharma's trade secret was misappropriated, but was there injury? There is no evidence that Unisys or the Internal Revenue Service, or for that matter anyone else, has duplicated the RDMS Emulation. What is undeniable, however, is that MDBS transferred six copies of the program in violation of its agreement. By doing this it deprived Dharma of the income that Dharma would have received had it sold the copies directly to Unisys. But that income, Dharma concedes, is only $18,000 yet the jury awarded it almost $77,000 on its trade secret claim. What could account for the difference?

 Dharma put in evidence that if its relations with Unisys hadn't soured as a result of its quarrel with MDBS, it would probably have sold at least 1,000 copies of the RDMS Emulation to Unisys, obtaining net royalties on these sales of $750,000. MDBS argues that since the evidence consisted entirely of testimony by Dharma's president, and was thus self-serving (as well as purely oral), it cannot provide a ground for an award of damages. This is not correct. There is no rule that damages can be proved only by documents, only by experts, or only by disinterested third parties. See, e.g., *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir.1995); *Miami Int'l Realty Co. v. Paynter*, 841 F.2d 348, 351 (10th Cir.1988). The only pertinent rules are that damages must be based on evidence rather than guesswork, wishful thinking, and pie-in-the-sky dreaming, *Independent Mechanical Contractors, Inc. v. Gordon T. Burke & Sons, Inc.*, 138 N.H. 110, 635 A.2d 487, 490–92 (1993); *Lester v. Resolution Trust Corp.*, 994 F.2d 1247, 1252–53 (7th Cir.1993); *Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499, 505–06 (7th Cir.1992); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415–16 (7th Cir.1992); *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 771 (1st Cir.1996), and that costs must be netted from revenues to determine the plaintiff's actual

loss. *Thompson v. Poirier*, 120 N.H. 584, 420 A.2d 297, 300 (1980); *Morley–Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373, 381–82 (7th Cir.1998); *Madigan Bros., Inc. v. Melrose Shopping Center Co.*, 198 Ill.App.3d 1083, 145 Ill.Dec. 112, 556 N.E.2d 730, 735 (1990). Dharma's president did this, by deducting from total expected royalties the expenses that his company would have incurred to maintain and support the software, which he estimated at 20 percent of the volume sold.

The jury awarded only a fraction of the damages sought, but the question is whether it should have awarded anything above $18,000 since the additional damages are not based on the commercial exploitation of Dharma's trade secret, which is the usual form that misappropriation takes. But by refusing to negotiate a license agreement, MDBS forced Dharma to undertake measures of self-protection likely to irritate Unisys by jeopardizing Unisys's ability to perform its contract with the IRS. The loss of future business with Unisys was a foreseeable consequence of MDBS's misconduct, and so Dharma was entitled to seek damages for that consequence. Consequential damages, as long as they are reasonably foreseeable, are the norm in tort cases (with an irrelevant exception discussed in *Rardin v. T & D Machine Handling, Inc.*, 890 F.2d 24 (7th Cir.1989)), and the misappropriation of a trade secret is a tort; we are just surprised not to have found any case in which consequential damages were awarded for such a misappropriation.

It's as if MDBS, having stolen a program from Dharma, inserted a bug in it as a result of which the program didn't work, and buyers blamed Dharma and refused to do any further business with it. That would be a consequence of misappropriation, and Dharma would be entitled to the foreseeable damages flowing from that consequence.

We conclude that the district court's rulings were correct and that the jury's verdict was within the outer bounds of the lawful and the reasonable. The judgment is therefore

AFFIRMED.