**TRUE NORTH COMPOSITES, LLC, Plaintiff–Appellee,**

v.

**TRINITY INDUSTRIES, INC. Defendant–Appellant.**

No. 02–1322.

United States Court of Appeals, Federal Circuit.

DECIDED: May 21, 2003.

Before CLEVENGER, RADER, and LINN, Circuit Judges.

LINN, Circuit Judge.

Trinity Industries, Inc. ("Trinity") appeals from a judgment of the United States District Court for the District of Delaware in favor of True North Composites, LLC ("True North") following a jury verdict and award of damages on its complaint for breach of a Carbodies Supply Agreement ("Agreement"). *True North Composites, LLC v. Trinity Indus., Inc.,* C.A. No. 99–783–RRM (D.Del. May 16, 2001) (*"Judgment"*). Because the district court erred as a matter of law in interpreting the Agreement as not predominantly a contract for goods subject to the limitations on damages of Delaware's version of the Uniform Commercial Code, 6 Del. C. § 1–101 et seq. (2000) ("UCC"), we conclude that True North was not entitled to the diminution of business value and closure cost damages awarded by the jury. We find the remaining damages supported by substantial evidence. Therefore, we *affirm-in-part and reverse-in-part* the district court's denial of Trinity's motion for judgment as a matter of law, *vacate-in-part* the district court's award of damages, and *remand* for proceedings consistent with this opinion.

## BACKGROUND

Because our opinion is directed to the parties, and because the facts are already recounted in some detail in the district

court's opinion denying Trinity's motion for judgment as a matter of law, *True North Composites, LLC v. Trinity Indus., Inc.*, 191 F.Supp.2d 484, 490–513 (D.Del. 2002) (*"Order"*), we discuss only those facts relevant to our decision.

The Agreement was entered into by True North and Trinity for the purpose of co-developing and building composite railcars using a patented manufacturing technique licensed to True North and known as SCRIMP technology. *Order* at 491. The Agreement called for True North to produce composite carbodies, the box-like structures of railcars. For its part, Trinity agreed to separately manufacture steel undercarriages, with wheels and a platform. True North was then to mount its carbodies to Trinity's undercarriages to create complete railcars. Following assembly, Trinity was responsible for marketing and selling the railcars. *Id.*

The Agreement contemplated the eventual production of 2000 railcars and specified that Trinity would pay a price per carbody for the construction and mounting of the first 500 carbodies. The price of the remaining 1500 carbodies was to be set by taking True North's estimated costs of production, adding a 10% profit, and tacking on an additional payment of $3647. *Id.* If Trinity's composite railcar sales showed a profit in excess of 13%, the Agreement called for True North and Trinity to evenly divide the excess profits. *Id.* Finally, the Agreement provided that it was to be governed by Delaware law.

Following cost overruns and difficulties in agreeing on final specifications, includ-ing length of the carbodies, True North filed a complaint in the United States District Court for the District of Delaware on November 12, 1999, alleging that Trinity breached the Agreement and its duty of good faith and fair dealing by refusing to negotiate in good faith on the final specifications of the carbodies, by refusing to purchase carbodies on the terms required by the Agreement, and by ordering True North to stop production of the 68–foot carbodies. *Id.* True North also sought a declaratory judgment that it did not breach the Agreement.[1] Trinity answered denying True North's allegations, asserting various affirmative defenses, and counterclaiming that True North breached the Agreement and its duty of good faith and fair dealing, among other things. *Id.* at 493.

At trial, Trinity argued that Delaware's version of the UCC governed the Agreement because it was a contract predominantly for goods and that the UCC limited the types of damages that True North could be awarded if breach were found. *See* 6 Del.C. § 1–106(1) (limiting remedies to the extent "that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had"). Trinity suggested a jury instruction and verdict form consistent with its position. The district court rejected Trinity's requested instruction and verdict form, noting that it considered the Agreement to be not predominantly a contract for goods, and thus, not governed by the UCC. *Id.* at 512.

---

1. True North's complaint also originally alleged federal patent and antitrust claims. On the eve of trial, the parties resolved the patent claim and True North withdrew its antitrust claim. The district court agreed to the parties' request that the district court retain jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367. *Order* at 489–90. Following the filing of this appeal, we determined that appellate jurisdiction is proper in this court. *True North Composites, LLC v. Trinity Indus., Inc.*, 02–1322 (Fed.Cir. July 19, 2002).

The jury found that Trinity breached the Agreement and awarded lost profits for the first 500 carbodies of $4,143,641.29. It also awarded $6,425,000 for True North's diminution in business value; $484,334 for unreimbursed tooling and equipment costs; $3,226,770 for unreimbursed learning curve costs; and $302,965 for closure costs, for a total of $14,582,710.29. The jury also found that Trinity had breached its duty of good faith and fair dealing, and awarded damages of $241,107. On Trinity's counterclaims, the jury found that True North did not breach the Agreement or its duty of good faith and fair dealing. On May 16, 2001, the court entered judgment in favor of True North and against Trinity in the amount of $14,823,817.29. *Judgment* at 1.

Following the entry of judgment, True North filed a motion to enter judgment on several remaining requests for declaratory relief. Trinity renewed its motion for judgment as a matter of law, arguing that True North was not, as a matter of law, entitled to damages for diminution of business value, closure costs, lost profits, and the unreimbursed tooling and equipment costs and learning curve costs, because these damages are either barred by the UCC or are speculative. Moreover, Trinity argued that True North was not entitled to separate damages for breach of the duty of good faith and fair dealing, characterizing it as an impermissible double recovery. Trinity also moved for a new trial and/or to alter or amend the judgment, arguing that the court erroneously admitted evidence, that the court gave erroneous jury instructions, that the jury's findings were against the great weight of the evidence, and that the damages awarded were excessive and unjust. *Order* at 513.

The court denied Trinity's motion for judgment as a matter of law. *Order* at 520–527. The court granted True North's mo-tion to enter judgment on declaratory re-lief, granted-in-part Trinity's motion to al-ter or amend the judgment to the extent necessary to vacate the jury's award of separate damages for breach of good faith and fair dealing, *id.* at 530, and entered an amended judgment reducing the amount of damages awarded. *True North Composites, LLC v. Trinity Indus., Inc.*, 191 F.Supp.2d 484 (D.Del.2002) (*"Amended Judgment"*).

Trinity appeals to this court, seeking review of the district court's denial of its motion for judgment as a matter of law as to the issues of whether the Agreement is governed by Delaware's version of the UCC and whether the jury's damage awards for lost profits and diminution of business value are supported by substantial evidence. Trinity does not appeal the district court's determination that the jury's damage awards for tooling and equipment costs and learning curve costs were properly awarded and supported by substantial evidence. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

### I

In deciding procedural and non-patent matters, this court applies the law of the regional circuit where an appeal from the district court would normally lie. *See Thompson v. Haynes*, 305 F.3d 1369, 1374, 64 USPQ2d 1650, 1653 (Fed.Cir.2002). In the Third Circuit, a denial of a motion for judgment as a matter of law is reviewed de novo. *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir.1993). Judgment as a matter of law against a party is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue...." Fed.R.Civ.P. 50(a)(1); *see also*

*Glenn Distrib. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294 (3d Cir.2002). The Third Circuit reviews contract construction–including the legal consequences flowing from the terms of an agreement–de novo. *See Ram Const. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir.1984). As to sufficiency of proof on damages, a plaintiff must provide evidence from which damages may be calculated to a "reasonable certainty." *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 668 (3d Cir.1998).

## II

At the heart of Trinity's motion for judgment as a matter of law are two main issues: 1) the construction of the Agreement and the legal consequences flowing therefrom as to damages; and 2) the sufficiency of the evidence in support of the jury's damages determinations.

## III

We begin with the construction of the Agreement and specifically whether the Agreement is governed by Delaware common law or the UCC. The distinction has significance on the damages resulting from a breach. On the one hand, damages for breach of contract under Delaware common law typically include both "damages for breach and those consequential damages that were reasonably foreseeable at the time the contract was made." *Pierce v. Int'l Ins. Co. of Illinois*, 671 A.2d 1361, 1368 (Del.1996). On the other hand, contractual damages under the UCC are limited and include only that needed to put "the aggrieved party ... in as good a position as if the other party had fully performed but neither consequential or special nor penal damages" may be awarded. 6 Del. C. § 1–106(1) (2000).

The district court determined that common law, rather than the UCC, governed the Agreement. The court reasoned that, because the UCC only applies to "transaction[s] in goods," 6 Del. C § 2–102, and because the Agreement was a mixed contract for goods and services, a threshold determination must be made as to "whether the contract is predominantly or primarily a contract for sale of goods or for services." *Glover Sch. & Office Equip. Co. v. Dave Hall, Inc.*, 372 A.2d 221, 223 (Del.Super.Ct.1977). The court concluded from the terms of the Agreement that the sale of goods was not predominant and gave three reasons for its determination. *Order* at 522–23. First, the court concluded that the contract's requirement to design the new railcars to unsettled and changing specifications demonstrated that the Agreement was a contract for services. Second, the court found persuasive the fact that True North played a direct role in the design and construction of the production tooling and equipment and that Trinity not only reimbursed True North for the tooling and equipment costs, but also agreed to pay a premium above the price of the railcar for learning curve costs. From this, the district court concluded that the design and construction of the production process itself was a significant component of the Agreement and that the contract was not merely for goods. *Order* at 522. Third, the court found support for its conclusion that the Agreement was not predominantly for goods in the requirement that True North attach the underframes supplied by Trinity and that True North lease land to Trinity for production of the underframes. The court cited *Glover School and Office Equipment*, 372 A.2d 221, and *Wharton Management Group v. Sigma Consultants, Inc.*, 1990 WL 18360, (Del.Super.Ct. Jan. 29, 1990), in support of its conclusions. It distinguished the cases cited by Trinity, *Micro Data Base Systems, Inc., v. Dharma Systems, Inc.*, 148

F.3d 649, 655 (7th Cir.1998) and *Neilson Business Equipment Center, Inc. v. Monteleone,* 524 A.2d 1172, 1174 (Del.1987), on the ground that, unlike these cases, the Agreement in the present case did not simply require customization of an existing product, but rather, the creation, design, and building of an entirely new product, including the equipment needed to make it. *Order* at 523.

Before this court, Trinity argues that the UCC governs the Agreement, that the UCC does not permit an award of consequential damages, that diminution of business value and closure costs are consequential damages, and that the jury's award of damages in these two categories must therefore be vacated as a matter of law. In the alternative, Trinity argues that the question of whether the Agreement was predominantly for goods or services was a question for the jury and requests that we vacate the district court's determination and remand the issue for a new trial. True North does not dispute that diminution of business value and closure costs are consequential damages, but asserts that the district court properly concluded that the Agreement was not within the UCC. We agree with Trinity that as a matter of law the UCC governed the Agreement.

## IV

Under Delaware law, a determination of whether a contract is subject to the UCC requires that a court "review the factual circumstances surrounding the negotiation, formation, and contemplated performance of the contract to determine whether the contract is predominantly or primarily a contract for the sale of goods." *Neilson,* 524 A.2d at 1174.

Although the district court focused on the performance contemplated by the Agreement, *Order* at 522, Trinity argues that various aspects of both the contemplated performance and the formation of the contract support its assertion that the UCC governs the Agreement. In particular, Trinity argues that the very language of the Agreement demonstrates that the parties intended to enter a contract predominantly for the sale of goods; that the inclusion of provisions excluding warranties demonstrates that the parties intended the UCC to govern; that the specification of payment terms by railcars purchased is indicative of a goods contract; and that the requirement of some design effort does not remove the Agreement from the realm of the UCC.

With respect to the language of the Agreement, Trinity notes that the terms used and agreed to in the formation of the Agreement are indicative of a contract for goods, including "purchase," "buyer," and "seller." True North echoes the district court's reasoning for concluding the Agreement to be not predominantly for goods–that the Agreement requires the design of railcars to unspecified specifications, includes compensation for the unreimbursed tooling and equipment costs and learning curve costs, and specifies additional service components, such as leasing and mounting. True North also contends that the Agreement includes other evidence that the contract was predominantly not for goods, such as a required commitment of exclusivity by True North.

We agree with Trinity and conclude that the language of the Agreement fairly attests to the "goods-centric" nature of the contract. The Agreement is entitled "Carbodies Supply Agreement." The "whereas" clauses in the preamble of the contract characterize the Agreement as setting forth the "rights and obligations regarding the production ... and sale ... of carbodies." The first provision of the Agreement concerns the "Sale and Purchase of the

Carbodies." The pricing and invoicing schemes set forth in the Agreement are on a per-carbody basis. The third section of the Agreement is entitled, in part, "Delivery Schedule," and sets forth a release schedule based upon the number of carbodies produced. Overhead costs are also allocated on a carbody basis, and all tooling and production equipment paid for under the Agreement must be turned over at the completion of the contract. There are sections of the Agreement devoted to subsequent carbody orders and excessive production. And finally, the termination provisions of the Agreement are grounded in either the failure of Trinity to deliver carbodies or the failure of True North to pay for carbodies. Even were we to agree with True North that the aspects it cited were probative of a contract not predominantly for goods, those aspects are not outweighed by the clear language and provisions of the Agreement cited above. Thus, the best evidence of the formation and contemplated performance of the contract—the very language of the Agreement itself—establishes that the contract is predominantly concerned with and primarily provides for the sale of goods.

As Trinity next argues, section 8.1 of the Agreement excludes certain warranties as is typical of a contract for the sale of goods. True North, on the other hand, contends that the inclusion of the warranty provisions is probative of the parties' recognition that the UCC did not apply and that the inclusion of the provisions indicates that the parties "endeavored to make explicit that the UCC did not apply to their arrangement." We disagree with this strained assertion. The exclusion of warranties, as well as the wording and format of the exclusion provisions themselves, fit precisely within Delaware's UCC section 2–316(2). 6 Del. C. § 2–316(2) (2000). This is consistent with the conclusion that, at the formation of the contract,

the parties intended that the UCC govern the Agreement.

Another factor in determining whether a mixed contract is predominantly for goods or services is the allocation of payment terms. *See, e.g., Glover*, 372 A.2d at 223; *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1330–32 (11th Cir.1998). In this case, the Agreement clearly allocates price by carbody, that is price per goods delivered. True North argues that the division of profits in excess of 13% is indicative of a contract for services and that Trinity's argument neglects a number of service aspects that are not quantified in the Agreement. The division of excess profits does not change the fact that the main basis for price allocation is on a per-carbody basis. Because the document to be construed is the Agreement, True North's arguments about aspects not quantified, and for which it provides no record citations, are not persuasive. Thus, we agree with Trinity that this factor also supports the conclusion that, at the time of formation as well as by the contemplated performance, the Agreement was predominantly a contract for goods.

Trinity also argues that, even though the contract calls for products to be modified in specified circumstances, that does not necessarily mean that the contract is predominantly one for services, because the UCC includes contracts for "specially manufactured goods." *See Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675 (3d Cir. 1991). The UCC explicitly states that goods include "all things (*including specially manufactured goods*) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action." 6 Del. C. § 2–105(1) (2000) (*emphases added*). Trinity contends that some amount of services are rendered in the performance

of specially manufactured products contracts and that such incidental service activity does not remove the agreement from UCC coverage. True North argues that this case instead is similar to those where engineering services predominate. The Agreement, however, does not reflect a contract where special engineering skills and services are predominant; rather, as noted above, the very language of the Agreement indicates that it is a contract predominantly for and primarily concerned with the production of carbodies.

Moreover, we find that the cases cited by the district court, as well as the characterization by the district court of the cases cited by Trinity, do not support True North's position. The district court cited *Glover* and *Wharton Management* in concluding that the Agreement was predominantly for services. *Glover*, 372 A.2d 221; *Wharton Mgmt. Group*, 1990 WL 18360. The facts of these decisions are distinguishable from those of the present case. In *Glover*, the contract was for the provision and installation of school lockers. 372 A.2d at 223. The *Glover* court determined that the goods in question, the lockers, were of standard issue and not specially manufactured for the job. *Id.* Thus, the primary focus of the contract, and what the buyer was bargaining to obtain, was the service component, or the installation. In *Wharton Management*, the contract was for the design, development, and installation of a computer system. 1990 WL 18360, *3. The court in that case determined that, although the end result may have been a software product, the contract was primarily to obtain the special skills and abilities provided by the seller's programmers–a service component. *Id.* Here, as noted above, the contract is predominantly for the provision of goods—carbodies. That there are related service components, such as the lease of land or the mounting of the carbodies onto the under-

carriages, does not change the fact that what Trinity contracted for under the Agreement was a product, not a service.

We also disagree with the distinctions drawn by the district court over the cases cited by Trinity—*Micro Data Base* and *Neilson*. In *Micro Data Base*, the court found that a contract for the sale of a customized computer program based on a basic program was a contract for goods—notwithstanding the programming effort required. 148 F.3d at 655. In *Neilson*, the court similarly found that a contract for a customized computer system was a contract for goods even though some customizing services were required. 524 A.2d at 1174. The district court distinguished *Micro Data Base* and *Neilson* from the present case based on the fact that each of the prior cases concerned customization of an existing product. That distinction finds no basis in law; the UCC does not distinguish between specially made goods that are customized from existing products and goods that are entirely specially made. Further, there is no indication in either *Micro Data Base* or *Neilson* that the buyer in either case was bargaining for anything except a specially made product; the service component of the contracts in both cases was ancillary to the product actually sought. As noted above, the facts in this case are similar. Trinity was ultimately bargaining to receive specially made goods, and the service components noted by the district court were merely ancillary to those goods.

Finally, True North finds dispositive, or at least persuasive, a comment of the district court at trial, observing "[a] lot of the duties that the plaintiff has identified as having been breached are duties that don't really relate themselves to the good itself, but to duties arising out of a relationship between the parties." True North then cites *Glover*, arguing that if the cause of

action arises from exclusively the goods portion or exclusively the services portion of the contract, there is no need to determine whether goods or services are predominant in a hybrid contract and that the determination may rest solely on the portion from which the cause of action lies. *Glover*, 372 A.2d at 223. We are not persuaded by this argument. First, the court's observation seems to be little more than a passing comment made in open court and is not reflected in the court's reasoned opinion denying Trinity's motion for judgment as a matter of law. Nor is it supported by any evidence. Further, True North mischaracterizes the comment as meaning that the cause of action relates to the services aspects of the contract. There is a difference between "duties arising out of a relationship between the parties" and duties arising from the services portion of the Agreement. Second, the significance of this comment must be tempered by the court's own characterization of True North's complaint: "True North alleges that Trinity breached the CSA, including the warranty of good faith and fair dealing, by refusing to negotiate in good faith on the final specifications of the carbodies, *refusing to purchase* carbodies on the terms required by the CSA, and ordering True North to *stop production* of the 68–foot carbodies." *Order* at 492 (emphasis added). Because the language of the Agreement strongly indicates that the contract is predominantly for the sale of goods and True North's allegations are also related to sale of the goods, not the service components as True North contends, we disagree with True North.

For all of these reasons, we hold that the district court erred as a matter of law in concluding that the Agreement is not predominantly a contract for goods governed under Delaware's UCC. Because we hold that the Agreement falls under the UCC, the award of consequential damages, namely diminution of business value and closure costs, cannot stand. Those portions of the judgment are hereby vacated.

In view of our holding, we need not and do not address Trinity's alternative argument that the question of whether goods or services predominated should have been resolved by the jury.

V

Trinity argues that the jury's awards of $4,143,641.29 for True North's lost profits and $6,425,000 for diminution of True North's business value were unsupported by sufficient evidence or based on speculation, and thus should be reversed. Because the award of diminution of business value is vacated as a form of consequential damages not permitted by the UCC, we need only consider Trinity's sufficiency of evidence argument as to lost profits.

Trinity contends that the award of $4,143,641.29 for True North's lost profits is speculative, because lost profits are measured by subtracting costs from revenue and, here, evidence of that calculation was not entered. Trinity argues that True North's expert simply assumed a 10% profit without calculating actual profits or considering that such a 10% profit would be unattainable because of the high costs involved. True North counters, arguing that its expert did rely on profit estimates found in the Agreement and took into account the cost overruns charged to True North. *Order* at 526. Although Trinity offered contradictory evidence, the jury credited the testimony of True North's expert, which was based at least in part on profit estimates both parties agreed to during the formation of the Agreement and found to be reasonable. *Id.* "Speculative profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference." *True*

274

*North Composites, LLC v. Trinity Indus., Inc.*, 191 F.Supp.2d at 526 (quoting *Tanner v. Exxon Corp.*, No 79C–JA–5, 1981 WL 191389, *2 (Del.Super.Ct. July 23, 1981)). Thus, although thin, the evidence supporting the award of lost profit damages is not without a "reasonable basis for inference." *Id.* We affirm the award of lost profits.

## CONCLUSION

We hold that the Agreement was predominantly for the sale of goods and is, thus, governed by the Delaware UCC. Because the district court erred as a matter of law in concluding that the Agreement was not predominantly for goods, we reverse that part of the district court's denial of Trinity's motion for judgment as a matter of law. Because consequential damages are not permitted under the UCC, we vacate the award of $6,425,000 for diminution of business value and $302,965 for closure costs. And because the jury's award of lost profits was supported by substantial evidence, we affirm that portion of the district court's denial of Trinity's motion for judgment as a matter of law. Because Trinity did not appeal the district court's denial of its motion for judgment as a matter of law as to the unreimbursed tooling and equipment costs and the learning curve costs, we do not disturb that portion of the judgment.

## COSTS

No costs.