Douglas E. ROSENTHAL Constantine Cannon, LLP, Appellants/Cross–Appellees,

v.

SONNENSCHEIN NATH & RO-SENTHAL, LLP, Appel-lee/Cross–Appellant.

Nos. 08–CV–1003, 08–CV–1056.

District of Columbia Court of Appeals.

Argued Nov. 13, 2009.

Decided Dec. 24, 2009.

---

Gary J. Malone and Ankur Kapoor, with whom S. Michael Kayan, Robert L. Begleiter, and Rachel Gilliar were on the brief, for appellants/cross-appellees.

James Hamilton, with whom David I. Ackerman was on the brief, Washington, for appellee/cross-appellant.

Before BLACKBURNE–RIGSBY and OBERLY, Associate Judges, and FARRELL, Senior Judge.

FARRELL, Senior Judge:

These consolidated appeals present a welter of issues arising from a dispute over the compensation that a law partner was owed by his firm for work done chiefly on behalf of parties claiming damages from the Libyan government for the destruction of Pan Am Flight 103 over Lockerbie, Scotland in 1988.

Appellant/cross-appellee Douglas E. Rosenthal (hereafter Rosenthal) was awarded more than $3.7 million in compensation by a Superior Court jury for breach of the implied covenant of good faith and fair dealing by his former law firm, Sonnenschein Nath & Rosenthal (hereafter

SNR).[1] Rosenthal appeals, arguing mainly (though not only) that the trial judge erroneously reduced the damage award because Rosenthal had retired from SNR during one of the two relevant contract periods of employment. SNR, as cross-appellant, counters that Rosenthal is precluded from challenging his compensation for the first of the relevant contract periods because he agreed to accept the compensation number at the time; and, as to the second period, argues that the evidence failed to support a cause of action for breach of the implied covenant under governing Delaware law. For its part, SNR won damages of $300,000 from the same jury from Rosenthal and his new employer, the law firm Constantine Cannon, LLP, for tortious interference with SNR's retainer agreement with a former client and the firm's entitlement to $1.6 million in attorney fees resulting from the Libya litigation.

We hold that Rosenthal could not properly recover for the first employment period in question (2003–2004), but that the jury's sizable award of damages for the second period (2005–2006) is supported by the evidence. Moreover, the trial judge erred, as to that period, by reducing the damage award to the extent of compensation Rosenthal would have been entitled to from SNR had he not retired from the firm. At the same time, the judge erred prejudicially in limiting Rosenthal's proof of the compensation he should have received during the 2005–2006 period, which entitles him to a new trial on compensatory damages. For that reason, we will order the unusual but permissible disposition of permitting Rosenthal to elect on remand between a new trial on damages and acceptance of the jury verdict reduced as required by our decision. *See* D.C.Code § 17–306 (2001) (court of appeals on re-

view may "direct the entry of such appropriate order ... or require such further proceedings ... as is just in the circumstances"). Finally, we reverse the judgment holding Rosenthal and Constantine Cannon liable for tortious interference, because that suit amounted to a claim for wrongful involvement in litigation and SNR did not meet the requirements as a matter of law for that cause of action.

I.

In 1993, Rosenthal and others filed a lawsuit against the nation of Libya for its role in the destruction of Pam Am Flight 103 on behalf of families of persons lost in the disaster. In 1994, Rosenthal joined SNR as an equity partner in the firm's Washington, D.C. office and continued to pursue the Libya litigation along with his other work. According to the firm's 1995 Partnership Agreement (hereafter "the Agreement"), which Rosenthal signed, each equity partner receives a percentage of the firm's annual income. The Agreement vests in the Policy and Planning (P & P) Committee the authority to set, and readjust every two years, the percentage of net firm income to be earned by each equity partner "in accordance with procedures established from time to time by the P & P Committee." At the relevant times, a partner's compensation for a given two-year period was determined by a two-step process: first by setting a "contract number," which was the base profit share for each partner at the beginning of the two-year period, then by decreasing or increasing this number at the end of each year to reflect the firm's actual financial performance for that year. At trial, the parties disputed the relative importance, under criteria adopted by the P & P Committee, of factors such as collections, billable

---

1. The "Rosenthal" in the firm name is not Douglas E. Rosenthal.

hours, and how billing was credited for contingent fee cases (such as the Libya litigation) in setting contract numbers.

The relative weight of these factors was important [2] because, in late 2003, the Libya case settled and over the next year SNR received an aggregate of nearly $18 million in attorney fees from the case. The P & P Committee set Rosenthal's contract number at $800,000 for the 2005–2006 contract period, compared to his $325,000 contract number for the previous period of 2003–2004. Believing this to be an inadequate reflection of his work leading to the Libya fee collection and his other work in the past two years, Rosenthal sought reconsideration of the proposed compensation by the P & P Committee, unsuccessfully.

Rosenthal left SNR at the end of July 2005 and subsequently joined Constantine Cannon, LLP. In September of that year he filed suit against SNR in Superior Court, alleging, *inter alia*, breach of the Agreement's implied covenant of good faith and fair dealing in the determination of his contract numbers for 2003–2004 and 2005–2006. The trial judge instructed the jury on the definition of this covenant under Delaware law,[3] and the jury returned a verdict for Rosenthal on that count, awarding him damages of $3,730,000. Specifically, it found that he was entitled to receive $500,000 for each year for the 2003–2004 period, and $1,365,000 for each year of 2005 and 2006. On the other hand, the jury found for SNR on its counterclaim alleging tortious interference by Rosenthal and Constantine Cannon, and awarded SNR $300,000 on that claim.

After both parties filed motions to amend the judgment, the trial judge reduced Rosenthal's damage award to $365,639, reflecting (1) compensation actually received by Rosenthal from SNR and Constantine Cannon during the relevant periods, and (2) the judge's conclusion that Rosenthal was not entitled to damages for the period after what the judge had ruled to be his voluntary retirement from SNR.[4] The judge also deducted the $300,000 in damages awarded to SNR, resulting in a final judgment of $65,639 for Rosenthal and against SNR.

## II.

■ SNR, in its cross-appeal, challenges Rosenthal's entitlement to any damages for the 2003–2004 contract period because, after the P & P Committee set his contract number for that period, he signed a "Schedule A" form stating that number and thereby agreed to the base compensation amount for the succeeding two years. The trial judge denied summary judgment on this point, believing that Rosenthal's signature on the form only acknowledged the contract number the firm was proposing and did not constitute acceptance of it. We think SNR's position is the only one fairly supported by the record.

SNR's practice, following determination of an equity partner's contract number for the next two years, was to circulate a Schedule A form for the partner to sign

---

**2.** Or at least the jury could so find, although SNR strenuously asserted that its determination of contract numbers was holistic and "non-formulaic."

**3.** A 2003 amendment to the Agreement provides that "[t]his Partnership Agreement and the partnership shall be governed by the laws of the State of Delaware."

**4.** The judge had earlier granted summary judgment to SNR on Rosenthal's claim for breach of the Agreement's mandatory retirement clause, concluding as a matter of undisputed fact that he had retired voluntarily from the firm.

pursuant to Section 3.7 of the Partnership Agreement. That section provided:

> [E]ach Equity Partner shall receive ... the percentage of Net Income to Equity Partners ... stated in Schedule A ... as changed from time to time in accordance with this agreement, each initialed for identification by the Equity Partner whose percentage of Net Income ... is therein stated....

The Schedule A form itself listed the partner's percentage of firm income and stated:

> By executing this Schedule A, I also confirm that I have received a copy of the SNR Amended and Restated Partnership Agreement made as of January 1, 1995, and I hereby re-execute said Agreement as modified by subsequent additions and withdrawals of Equity Partners and adjustment of Schedule A in accordance with the terms of said Agreement.

The undisputed testimony at trial was that, to remain an equity partner at the firm, each equity partner had to sign Schedule A for the next two-year period. Accordingly, Rosenthal signed the Schedule A in 2002 for the succeeding two years. (He did not sign one in 2004, however, because the firm was considering a new partnership agreement and thus the schedules were not circulated until after he left the firm in 2005).

Rosenthal argues that SNR, as a law firm, certainly knew how to draft an express waiver of any challenge to the contract number if that had been the intent behind the Schedule A. While that is true—there is a certain periphrastic quality to the language in the Agreement and the Schedule A itself setting forth its meaning and effect—the consequence of Rosenthal's signing the schedule allows for no reasonable doubt. By signing the Schedule A, he "re-executed" the Partnership Agreement "as modified" to reflect the "adjustment[ ] of Schedule A" stating his contract number for the next two years. That number thus effectively became a term of the Agreement he accepted by signing the incorporated schedule.

In his deposition testimony, read into the record at trial, Rosenthal recognized that by signing the Schedule A he was "committing myself to the ... compensation arrangement ... for me as set forth in this Schedule A ... and this is my agreement to accept that compensation level in each of these two-year periods." Elsewhere he testified that by signing Schedule A he "reaffirm[ed]" his "understand[ing]" of what he would be paid for the next two years, even if he did not consider this to be "fair and reasonable." Where, as here, an equity partner's continued employment by the firm was conditioned on his signing the schedule, it makes no sense to argue, as Rosenthal does, that SNR merely wanted an "acknowledgment" of its proposed contract numbers without any greater legal effect. Instead, the evident purpose of the Schedule A was to resolve any outstanding compensation disputes rather than to permit later controversy, and possibly lawsuits, challenging the contract numbers. Rosenthal is thus foreclosed from disputing the contract number for 2003–2004 that he accepted.

### III.

SNR is on considerably weaker footing in arguing that judgment as a matter of law should have been entered in its favor for the 2005–2006 contract number. That argument presents a straightforward question of sufficiency of the evidence, and the law is settled that unless no reasonable juror could have found in favor of the verdict the jury reached, it must be sustained. *See, e.g., Dyer v. William S.*

*Bergman & Assocs.,* 657 A.2d 1132, 1136 (D.C.1995). The trial judge instructed the jury on breach of the implied covenant of good faith and fair dealing under Delaware law, quoting for the jury the Delaware Supreme Court's most recent exposition of the covenant in *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434 (Del. 2005). There, the court explained that resort to the implied covenant—which "attaches to every contract"—is a "quasi-reformation" of the contractual agreement itself and thus "should be a rare and fact-intensive exercise, governed solely by issues of compelling fairness." *Id.* at 442 (internal quotation marks and citations omitted). But, while stressing caution in application of the covenant, the court did not define it in the crabbed manner SNR advocates in its brief when it argues (for example) that the conduct at issue must have "involved fraud, deceit, or misrepresentation" to be a breach of the covenant. *See* Br. for SNR at 31 (citations omitted).[5] Rather, *Dunlap* explains—and the trial judge here instructed—that the implied covenant requires a contracting party "to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party ... from receiving the fruits of the bargain"; it subjects to liability parties whose conduct "frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms"; and Delaware law recognizes "the occasional necessity of implying contract terms to ensure [that] the parties' reasonable expectations are fulfilled." *Dunlap,*

878 A.2d at 442 (citations and internal quotation marks omitted).

■ Viewed in the light most favorable to Rosenthal, the evidence he presented allowed the jury to find that SNR's conduct in setting his contract number for the 2005–2006 period was an unevenhanded, and thus unreasonable, application of the firm's criteria for setting compensation by decisionmakers (the P & P Committee) who were in a "position to control implementation of the [Partnership A]greement's terms." The Agreement itself listed no criteria by which contract numbers were to be fixed; it left the process for doing so to the P & P Committee. As mentioned, the parties presented conflicting evidence about the importance that individual considerations—such as collections and billable hours during the previous years—were intended to play in the determination. SNR highlighted the P & P Committee's written statement of compensation policy which expressly made the contract number decision "non-formulaic," one that took into account a "wide range of quantitative and qualitative factors." But Rosenthal countered with evidence that the written policy stressed collections and billable hours by stating that " 'billing credit,' realization and billable hours are the three [factors] featured and emphasized ... in the reports specially prepared for [P & P] for use in the contract process." Moreover, Rosenthal's expert witness accountant, Michael Napolitano, had reviewed SNR equity partner compensation data and found a positive correlation

---

5. A single-judge decision of the Court of Chancery of Delaware, *Continental Ins. Co. v. Rutledge & Co.,* 750 A.2d 1219 (Del.Ch.2000), so held ("The Delaware Supreme Court has explicitly held that claimant must demonstrate that the conduct at issue involved fraud, deceit or misrepresentation in order to prove a breach of the implied covenant."). But the *Dunlap* decision, discussed in the

text, implicitly rejects so narrow an understanding of the doctrine in Delaware. The decision in *Merrill v. Crothall–American, Inc.,* 606 A.2d 96 (Del.1992), on which the Chancery Court judge had relied, involved a claim of deceptive inducement of another to enter into an employment contract—a form of breach of the implied covenant that by definition would implicate deceit or fraud.

between collections and future compensation—indeed, he said, "the higher the collection amount, the higher the correlation of compensation to collections" was for the years he reviewed. Evidence further allowed the jury to find that SNR generally did not treat (infrequent) contingent fee cases differently from all others in counting billable hours for compensation purposes.

Yet Rosenthal presented evidence that SNR had treated him very differently from other partners in setting his 2005–2006 contract number. At the same time that the jury could credit him with having generated much of the nearly $18 million in fees collected from the Libya case in 2003–2004 (placing him sixth among all equity partners in collections for the period), it heard testimony that his ratio of contract number to collections for 2005–2006 was less than half that of the other top earners of the firm, substantiating his expert's opinion that he had been compensated at a rate substantially below other partners with comparable performances. It further heard evidence that he was not given billable hour credit for the Libya work in the way the firm normally treated contingent fee cases. And, finally, there was evidence that SNR gave Rosenthal no credit for substantial collections—nearly $20 million—from antitrust litigation between Sun Microsystems and Microsoft despite what the jury could find was his shared role in bringing Sun Microsystems to the firm and a general SNR policy to give ongoing compensation credit for such origination.

In sum, although Rosenthal indeed was given a contract number for 2005–2006 more than double his previous one despite evidence (adduced by SNR) that questioned the quality of his work and the number of hours he had reasonably spent on the Libya litigation at the firm, the jury could fairly conclude that he had been dealt with arbitrarily for that period in relation to partners similarly situated, and thus denied "the fruits of the bargain" struck in the Partnership Agreement and related compensation policies of the firm. We have no basis on which to disturb the jury's findings in this regard.[6]

## IV.

As pointed out, the trial judge reduced the jury's award of damages to $365,639 because in his view Rosenthal could not recover for the period after he had left SNR voluntarily in July 2005. Rosenthal responds (a) that the judge erroneously failed to let the jury decide whether his departure was indeed voluntary or whether, as he maintains, he was forced to retire by SNR; and (b) that even if he had left the firm voluntarily, this does not bar him from receiving the benefit of the bargain the jury found SNR had denied him in setting his 2005–2006 contract number. Because we agree with Rosenthal on the latter point, the voluntariness or not of his departure is something we need not decide.

---

**6.** SNR cites to the *Dunlap* court's additional statement that "[o]nly when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of ... had they thought to negotiate with respect to that matter may a party invoke the covenant [of good faith's] protections." 878 A.2d at 442. It argues that by signing their own Schedule A's (and "re-executing" thereby the Partnership Agreement) for 2005–2006 after Rosenthal had left the firm, the other equity partners of SNR all implicitly approved his contract number for that period, hence "would [not] have agreed to proscribe it." This suggestion that all, or even any, of SNR's many partners beyond the P & P Committee ratified (and were even aware of) Rosenthal's compensation treatment merely by signing their own Schedule A's strikes us as fanciful, and we reject it.

■ Basic principles of contract law control this question.[7] The law awards damages sufficient to compensate the injured party for what it would have received had the contract been fully performed, as if the breach had not occurred. *See, e.g., Genencor Int'l, Inc. v. Novo Nordisk A/S,* 766 A.2d 8, 11 (Del.2000) ("remedy for a breach should seek to give the non breaching party the benefit of its bargain by putting that party in the position it would have been [in] but for the breach"). In order to receive that benefit, the injured party need not continue to perform; it may abjure the contract and sue for damages. *See, e.g.,* STANDARD CIVIL JURY INSTRUCTION FOR THE DISTRICT OF COLUMBIA No. 11–17 (2007) (injured party "ha[s] no further duty to perform under the contract"); *BioLife Solutions, Inc. v. Endocare, Inc.,* 838 A.2d 268, 278 (Del.Ch.2003) ("A party is excused from performance under a contract if the other party is in material breach thereof."). Employment contracts are no different from others in this regard. While the employee abjuring the contract upon breach generally must mitigate his damages, he may resign and do so elsewhere. *See, e.g., Ward v. American Mut. Liab. Ins. Co.,* 15 Mass.App.Ct. 98, 443 N.E.2d 1342, 1343 (1983) (in breach of employment contract claims, "[i]t is well established that a material breach by one party excuses the other party from further performance under the contract"); *Kass v. Brown Boveri Corp.,* 199 N.J.Super. 42, 488 A.2d 242, 247 (1985) (plaintiff who resigns because of material breach of employment agreement is entitled to seek full contract damages, because "[i]t would be unjust to permit [employer] to discharge

its liability for its clear breach ... by claiming that plaintiff voluntarily resigned").

■ Whether or not Rosenthal retired voluntarily, he did not have to remain with SNR while suing for breach of the covenant. Indeed, given the firm's policy of requiring a signing of the Schedule A's as a condition of an equity partner's continued employment, it is hard to imagine that the firm would have allowed him to remain a partner once he sued it. *See* Partnership Agreement Art. 8.6 ("cause" permitting removal of a partner, to be determined "conclusively" by three-fourths vote of equity partners, includes "conduct ... materially adverse to the best interests of the partnership"). SNR points to this court's observation in *Wisconsin Ave. Nursing Home v. District of Columbia Comm'n on Human Rights,* 527 A.2d 282 (D.C.1987), that "[h]ad [the plaintiffs] voluntarily quit their jobs at [defendant company, its] backpay liability would have terminated," because "a voluntary termination of employment represents a choice to incur a loss of earnings in violation of the employee's duty to make reasonable efforts to mitigate damages." *Id.* at 292. But *Wisconsin Ave. Nursing Home* concerned a claim of employment discrimination, not breach of contract, and in point of fact Rosenthal mitigated his damages by joining Constantine Cannon soon after his retirement. Nothing in law or logic made the retirement a bar to the benefits of the bargain he sought to obtain by a lawsuit once SNR breached the covenant of good faith and fair dealing. Accordingly, he is entitled to the 2005–2006 damages the jury awarded him for breach of

---

**7.** Under Delaware law, "[v]iolation of the duty of good faith and fair dealing is a breach of contract." *True North Composites, LLC v. Trinity Indus., Inc.,* 191 F.Supp.2d 484, 527 (D.Del.2002), *aff'd in relevant part,* 65 Fed. Appx. 266 (Fed.Cir.2003). On this issue of remedy for the breach of the covenant, it is a moot point—on which the parties express no disagreement—whether Delaware or District of Columbia law applies because the parties do not contend that the relevant law differs between the two jurisdictions.

the covenant, minus the compensation he received from SNR and Constantine Cannon for the relevant period.

## V.

Rosenthal goes beyond disputing the judge's reduction of his damages, however, and makes a twofold argument that the jury's award did not fairly reflect the compensation he should have received for 2005–2006. First, he contends that the jury was asked to find, and found, only the contract number he should have been given for that period, and that the judge erred in not increasing the award (on Rosenthal's post-trial request) to reflect SNR's net profits for each of 2005 and 2006 and his proportionate share of those profits. This was something the judge could have done, Rosenthal says, because the amount by which total net profits for those years exceeded the estimate underlying contract numbers was undisputed for those years, and thus a simple percentage calculation would yield the additional amount each partner was entitled to above his contract number.[8]

We reject the premise of this argument because it is clear from the record that for each year in question the jury was not instructed to find, and did not find, the contract number (or estimated compensation) Rosenthal should have received, but rather the actual compensation to which he was entitled. The judge told the jury that, if it found liability, "your job is to determine only the amount of compensation Mr.

Rosenthal should have received from [SNR] in . . . 2005[-]2006," after which the judge—not the jury—would perform the single remaining calculation of subtracting "the amount he actually received from [SNR] and Constantine Cannon in the same period." This charge was in keeping with Rosenthal's counsel's earlier request for the jury to be told to find "not the contract number" but "the amount of compensation he should have received." And on this basis Rosenthal's attorney, in summation, performed calculations for the jury of what Rosenthal "actually [should have] receive[d]," which was not—he said—"the contract number" but "the actual money that [partners] actually receive," including "plus or minus what the net profits are or net losses are." Contrary to Rosenthal's present assertions, neither this context nor the written verdict form, which merely instructed the jury to find "what amount . . . [he was] entitled to receive . . . for each year" including "contract years 2005–2006," permits a reasonable conclusion that the jury found only contract numbers and left an upward (or downward) adjustment for the judge to make based on actual profits.

Alternatively, however, Rosenthal argues that if the jury indeed found the actual compensation he deserved, the trial judge erred in excluding testimony by himself and his expert accountant, Napolitano, about the compensation he should have received for the years in question. He points out that, on the one hand, the judge

8. Rosenthal illustrates the calculation in his brief:

> Assume that an SNR equity partner's contract number was $1,000,000, based on an estimated net firm income of $100,000,000 for the following year. Thus, the partner's equity share is one percent. In [that year], SNR's net firm income exceeded its contract compensation estimate by 19.2 percent. Thus, in this example, SNR's 2003 net income would be $119,200,000. The partner would receive an additional 19.2 percent over his contract number, or $1,192,000. The partner's equity share, however, remains constant at one percent ($1,192,000 ÷ $119,200,000), because all equity partners receive an additional 19.2 percent over their individual shares, which total 100 percent.

would not let him state his own opinion of what his contract numbers should have been, taking into account his billable hours and collections, because in the judge's view "that [was] the role of the expert," Napolitano, whom Rosenthal planned to call; but that, on the other hand, the judge barred Napolitano from opining what the compensation should have been, especially after factoring in net profits for a year and Rosenthal's proportionate share thereof. The result, Rosenthal says, is that the jury was deprived of concrete help in arriving at numbers that reflected the magnitude of his undercompensation. We agree, as to both witnesses, that the judge erred in excluding the proffered testimony.

■ First, contrary to the judge's ruling that only an expert, not Rosenthal, could opine about the amount of his damages, our decisions are permissive in allowing "lay" opinion testimony by a plaintiff "on the value of [his] damages." *Columbus Properties, Inc. v. O'Connell*, 644 A.2d 444, 448 (D.C.1994) (citing cases). Rosenthal, as a partner of the firm since 1995, assuredly possessed information that could "assist the trier of fact," Fed.R.Evid. 702, concerning the criteria and practices employed by SNR in setting contract numbers for equity partners. Moreover, the fact that he would offer an opinion on the "ultimate issue"—*i.e.*, the contract numbers he should have received—was not a reason to exclude his testimony. *See, e.g., Carter v. United States*, 614 A.2d 913, 919 (D.C.1992); *accord,* Fed.R.Evid. 704(a). His own contemporaneous review, at the time his contract number was set, of what SNR partners call "the array" of each equity partner's contract number, compensation history, historical fee collections and billable hours gave him personal knowledge the jury could properly consider of what his compensation should have been. That the jury might have discounted this

testimony because of his obvious interest in the outcome affected its weight, not admissibility.

■ Similarly, we see no reason why Napolitano should not have been allowed to state an opinion of what Rosenthal's damage numbers were, especially on the ultimate compensation he should have earned after factoring in net profits for each year in question. The judge ruled that Napolitano was an expert "in the field of accounting" but not in "law firm compensation," and thus not qualified to offer an opinion on what Rosenthal's actual compensation should have been. But Napolitano's proffered testimony on this point was, first, what Rosenthal's SNR earnings would have been for the relevant years had his ratio of compensations to collections been set equal to the average ratio of top earners at the firm; and second, the amount by which SNR's admitted formula or methodology for adjusting contract numbers to reflect net income at year's end, see note 8, *supra*, would have increased his ultimate earnings. As an accountant, he was qualified to perform these arithmetical calculations without having to opine on matters beyond his expertise—such as how SNR or any law firm valued (say) collections or billable hours over other performance measures. The fact that the calculations netted a particular number or range of numbers, in Napolitano's view, and thus touched on the "ultimate issue," was—again—not grounds to exclude them, and any inaccuracies in his understanding of the net profits or other figures relevant to the calculation gleaned from SNR's records went to the weight of his testimony, not its admissibility.

■ Nor can we say that the exclusion of the relevant testimony by Rosenthal and Napolitano was harmless. *See Jenkins v. Strauss*, 931 A.2d 1026, 1037 (D.C.2007)

(noting this court's application, in civil cases, of the harmless error standard of *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), *viz.*, whether "[we can] say, with fair assurance ... that the judgment was not substantially swayed by the error"). On the issue alone of "what the net income of [SNR] was for any particular year" and thus how the jury could determine "an amount in excess of what [a partner's] contract amount should be," the trial judge himself acknowledged post-trial that the evidence was very weak. Thus we cannot say with confidence that Napolitano's testimony on this point would have furnished the jury with no significant evidence to fill the gap the judge himself identified. Equally important, in the absence of any other opinion testimony about the extent—reduced to an actual dollar amount—to which Rosenthal had been unreasonably treated in the compensation decision, his own opinion of what fair contract numbers should have been by comparison to partners similarly situated might have yielded a jury verdict closer to what Rosenthal maintains he had earned, especially from the Libya payoff.

We thus conclude that Rosenthal, should he so elect, see part IX, *infra*, is entitled to a new trial on damages for the breach of the covenant of good faith and fair dealing for the 2005–2006 period.[9]

## VI.

In addition to his claim for breach of the contractual covenant, Rosenthal alleged that SNR's undercompensation of him for the relevant years was a breach of its fiduciary duty to him under Delaware law. The jury found against him on this claim, but he argues that it did so because of the trial judge's overly-narrow jury instruction (despite his objection) on how Delaware defines a breach of fiduciary duty by partners of a law firm *inter se*. Rosenthal acknowledged below, however, and does not dispute here, that his compensatory damages for that tort could not exceed those the jury awarded him for breach of the contract. He seeks a new trial only because a favorable verdict on breach of duty would afford a basis—not provided by the contract cause of action—for the punitive damages his complaint also demanded. The issue of error in the instruction on breach of fiduciary duty is moot, however, because we hold (as did the trial judge) that the record as a matter of law fails to support a claim for punitive damages.

 The test for punitive damages in this jurisdiction is a rigorous one.[10] They are

a form of punishment. Their purpose is to punish unlawful conduct and to deter its repetition. Punitive damages are, accordingly, to be awarded only in cases of outrageous or egregious wrongdoing where the defendant has acted with evil motive, actual malice, or in willful disregard for the rights of the plaintiff.

*District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 725 (D.C.2003) (citations and

---

**9.** Rosenthal argues that the trial judge erred in denying his request for prejudgment interest. The judge rightly concluded, however, that D.C.Code § 15–109 (2001) barred the request because Rosenthal had not presented any claim for prejudgment interest to the trier of fact. *See, e.g., District of Columbia v. Pierce Assocs., Inc.*, 527 A.2d 306, 310–11 (D.C. 1987). Nonetheless, if Rosenthal elects to pursue the new trial on damages he is entitled to, we see no principle of preclusion that would keep him from presenting a claim for prejudgment interest to the jury for any damages it should award.

**10.** Rosenthal does not suggest that the test in Delaware is any less demanding nor, more importantly, why District of Columbia law would not govern this particular issue of remedy.

internal quotation marks omitted). In keeping with this high substantive burden, "the plaintiff must prove egregious conduct and the requisite mental state by clear and convincing evidence." *Id.*

 Rosenthal made no such showing here. The jury found liability for breach of the covenant of good faith and fair dealing based on law that required, as we have seen, proof of arbitrary or unreasonable conduct, not more. That standard did not require it to reach agreement on what motivated SNR's undercompensation of Rosenthal. It could have found, for example, that the compensation decision relied heavily on reports of underperformance or unjustified billing by Rosenthal that, as he alleged, the P & P Committee had made little effort to substantiate—a case of negligence or rash judgment, perhaps, but far from evincing evil motive, actual malice, or willful disregard of his rights. Nor do the other bits of evidence Rosenthal points to rise, individually or in the aggregate, to the level of egregious wrongdoing. It simply is not the case, for instance, that when he was directed by SNR in December 2002 to "[f]ocus as little as possible on the Libya case, consistent with our clients' interests," this amounted to a deliberate and unethical command to abandon the firm's Libya clients.[11] And the fact that a senior partner, Caryl Potter (instrumental in setting, but by no means the lone decisionmaker as to, compensation for the relevant periods), elsewhere appeared to treat Rosenthal "with disrespect and contempt" (Br. for Rosenthal at 38) does not nearly demonstrate that the compensation decisions of the P & P Committee were actuated by malice or evil motive. SNR presented a variety of evidence for the inference that

raising Rosenthal's contract number from $325,000 to $800,000 for 2005–2006 was reasonable credit—under the firm's "nonformulaic" approach to compensation—for the fees his Libya work had generated. While the jury found that he had been substantially undercompensated all the same, it had no clear and convincing evidence that ill-will, spite or any other form of malice had dictated the contract number reached by the multi-member P & P Committee.

## VII.

Rosenthal also appeals from two rulings by the trial judge regarding his retirement from the firm. First, he argues that SNR breached the mandatory retirement provision of the Partnership Agreement by forcing him to retire at age 65 instead of 70, as (he contends) the Agreement provided. Although he does not say so expressly in his brief, this presumably is a claim that he was entitled to damages in the form of compensation for the years beyond 2005–2006 up to and including 2010, when he would reach age 70.

The first difficulty we have with this claim is determining how his damages could ever be calculated for that period (he offers no help to us on the issue) given SNR's system of setting contract numbers by looking back, importantly if not exclusively, to immediate past performance by the partner. Since Rosenthal did not remain with the firm after July 2005, it is virtually impossible to see how a jury that found breach of the retirement clause could determine at what number his compensation should have been set for the years after 2006. On this ground alone—the speculativeness of his claim for dam-

11. Aside from emphasizing the qualifier in this directive ("consistent with our clients' interests"), SNR produced evidence that as late as November 2002 Rosenthal himself had characterized the settlement prospects for the Libya litigation as "problematic" and stated that "since May" the case "had gone sour."

ages—we could sustain the judge's ruling that, as a matter of law, he had not shown a breach of the retirement provision.[12]

■ But the record also supports summary judgment to SNR on this issue because it demonstrates, and Rosenthal does not dispute, that in 1999 the equity partners voted, by the required three-fourths margin under the Agreement, to change the retirement age to 65. Rosenthal almost certainly knew of that change because in late 2004, when he was purportedly told he would have to retire by the end of 2005, he did not question the decision but instead asked for a one-year extension of the date. And no evidence was proffered that the partners had rescinded the change of age by the time Rosenthal left the firm. His claim for breach thus resolves itself to the argument that, despite the partnership vote, SNR never formally amended the Agreement to reflect the age decision and therefore the change—or so a jury could find—somehow lapsed or never became legally effective. But he directs us to nothing in the Agreement that conditioned an amendment of this nature, reached in accordance with the sole provision expressly governing "Amendment," [13] on formal incorporation of the change into the Agreement. Indeed, where the drafters of the Agreement otherwise meant to require formal "written agreement" of the partners for a change, see § 9.1 of the Agreement, they knew how to do so expressly. SNR's conceded oversight in neglecting to conform the written agreement to the partners' decision does not persuade

us that triable issues remain on this point, on which summary judgment was thus properly granted.

■ Rosenthal's second assigned error regarding retirement is that the judge wrongly denied his request for declaratory relief to the effect that he is entitled to retirement benefits under the Agreement for any post–2006 period when his outside legal earnings are less than his retirement benefits.[14] He relies on § 3.3 of the Agreement ("Outside Remuneration"), which generally provides for an offset of outside earnings against retirement benefits, but not a disqualification from receipt of retirement.

The trial judge correctly ruled, however, that § 7.2 of the Agreement foreclosed this argument because Rosenthal was currently employed by a law firm in competition with SNR. That paragraph states:

> [A]n Equity Partner having retired hereby agrees, as a condition of his right to continue to receive Retirement Benefits under Article 5, not to (except with the consent of not less than two-thirds in interest of the Equity Partners) engage in the practice of law in any state in which the partnership has an office....

Rosenthal was admittedly practicing law at the time in New York, where SNR has an office. Thus section 7.2 unambiguously barred his receipt of retirement benefits while doing so; it cannot reasonably be read as merely subtracting his earnings

---

**12.** As mentioned earlier, the judge concluded that Rosenthal had not been forced to retire but had voluntarily chosen to do so. As before, we find it unnecessary to review that conclusion.

**13.** That provision, section 8.4 ("Amendment"), states only that "[t]his agreement may be amended at any time by the action of not less than seventy-five percent in interest

of the Equity Partners, provided that each amendment will similarly affect all Equity Partners."

**14.** He conceded that he was not presently entitled to retirement payments because his income from practicing law at Constantine Cannon exceeded his SNR retirement benefits at the time of the suit.

from that practice from otherwise payable retirement benefits.[15]

## VIII.

In 1997, SNR entered into a contingency fee agreement with Rose Mary Copeland to represent her, personally and in her capacity as administrator of the estates of her two grandchildren, in the Copeland family's wrongful death claims against Libya. The retainer agreement entitled SNR to attorney fees of one-half of 20% of the recovery for the estates of the two grandchildren, or $1.6 million. SNR's counterclaim against Rosenthal and Constantine Cannon in the present action alleged that they had tortiously interfered with the retainer agreement by inducing Mrs. Copeland to transfer the representation to Rosenthal and Constantine Cannon (which he had meanwhile joined) and to agree to pay Constantine Cannon the $1.6 million contingency fee.[16]

The complaint acknowledged, however, that in the meantime the United States District Court for the Southern District of New York (Judge Platt), before whom the litigation and eventual settlement of the Libya claims had been consolidated, had resolved the dispute over who deserved the $1.6 million attorney fees by awarding them entirely to SNR. Consequently, the damages SNR sought for the alleged tortious interference were limited to its attorney fees and expenses incurred in the motions practice before Judge Platt litigating its entitlement to the $1.6 million. The $300,000 in fees which the jury awarded SNR reflected what SNR's witness (Schadler) had testified at trial was the approximately "$300,000 [SNR] spent ... in the motions practice regarding the Copeland fee dispute."

On appeal, Constantine Cannon argues, among other things, that SNR's counterclaim essentially reduces itself to one for attorney fees and expenses under the wrongful involvement in litigation exception to the American Rule, *see generally Auxier v. Kraisel*, 466 A.2d 416, 420 (D.C. 1983), and that SNR's suit does not meet the requirements of that cause of action. In its brief, SNR does not dispute that its right to recover in Superior Court depended on satisfaction of the "wrongful involvement in litigation doctrine, which works as an exception to the American Rule [that each party pays its own fees]" (Br. for SNR at 65–66) (quoting *Taylor v. Tellez*, 610 A.2d 252, 255 (D.C.1992)). We hold that SNR failed as a matter of law to satisfy a key element of that test, so that the claim should not have been submitted to the jury.

 "To enjoy the benefit of this narrow exception,"

(1) [t]he plaintiff must have incurred attorney's fees in the prosecution or defense of a prior action;

---

15. Rosenthal's lone assigned error not yet addressed is that the trial judge should have let the jury decide his claims for quantum meruit and unjust enrichment, both predicated on the work he had done on the Libya litigation before joining (rather than while working at) SNR. But he admitted in deposition that the firm refused to enter into a "side agreement" or a separate agreement with him as an "individual partner[ ]" for his prior Libya work when he joined it; rather (he was told) "[t]here is one firm partnership agreement and it is the same ... terms for all partners." Thus, the Agreement he executed governed his compensation in its entirety, rendering his reliance on non-contractual equitable doctrines unavailing. *See, e.g., Fischer v. Estate of Flax*, 816 A.2d 1, 11 (D.C.2003) (quoting *Standley v. Egbert*, 267 A.2d 365, 368 (D.C. 1970)); *J.A. Moore Const. Co. v. Sussex Assocs. Ltd. P'ship*, 688 F.Supp. 982, 988 (D.Del. 1988).

16. The counterclaim contained an additional allegation of tortious interference not relevant here.

(2) the litigation ordinarily must have been with a third party and not with the defendant in the present action; and (3) the plaintiff must have become involved in such litigation because of some tortious act of the defendant.

*Safeway Stores, Inc. v. Chamberlain Protective Servs., Inc.,* 451 A.2d 66, 69 (D.C. 1982) (quoting *Biddle v. Chatel,* 421 A.2d 3, 7 (D.C.1980)). The first part of this test was concededly met here, and for present purposes we assume that a jury could fairly find that "some tortious act of" Rosenthal and Constantine Cannon caused SNR to expend the $300,000 in attorney fees and expenses. But the second element is equally critical: the prior litigation "must have been with a third party *and not with the defendant in the present action.*" *Id.* (emphasis added). *See Biddle,* 421 A.2d at 8–9 (denying fee recovery under doctrine because prior litigation was against defendant in present action, as well as third party). And that is where SNR's action fails.

Judge Platt in the federal court had jurisdiction over all matters related to the Libya litigation, including possible disputes over how contingent attorney fees resulting from a settlement would be distributed. Also, once Constantine Cannon asserted there an entitlement to all or part of the $1.6 million resulting from the Copeland portion of the settlement, it—as well as Rosenthal [17]—was undeniably a party to the motions practice in which SNR successfully disputed the effort to deny it any of the $1.6 million. Yet SNR, having prevailed in that litigation, made no effort to obtain attorney fees or related expenses for having been wrongfully forced to litigate over its entitlement to the award. While such fees, of course, would not have been available to it as a matter of course, Judge Platt had ample authority to enter-

tain and grant a request for fees if, as SNR maintains, Constantine Cannon had no colorable basis for asserting entitlement to all or any of the $1.6 million. *See, e.g., Chambers v. NASCO, Inc.,* 501 U.S. 32, 42–53, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (affirming award of attorney fees imposed under the bad faith exception to the American Rule and the court's inherent powers); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (attorney personally liable for attorney fees under bad faith exception); *Baker v. Urban Outfitters, Inc.,* 431 F.Supp.2d 351, 363, 365–66 (S.D.N.Y.2006) (federal court could award attorney fees against attorney that sought unwarranted financial windfall under either court's inherent power or 28 U.S.C. § 1927); *see also In re Austrian & German Bank Holocaust Litig.,* 317 F.3d 91, 98 (2d Cir.2003) ("Whenever a district court has federal jurisdiction over a case, it retains ancillary jurisdiction after dismissal to adjudicate collateral matters such as attorney's fees"). Indeed, as SNR's counterclaim itself pointed out, Judge Platt in awarding the $1.6 million to SNR had declared himself "troubled by what appeared to be an effort [by Constantine Cannon] to leave SNR in the dark about the distribution of the [Copeland settlement] proceeds" and its related contractual share of them. There is thus no reason to doubt that he would have treated seriously a fee petition alleging bad faith. Nor, for that matter, did SNR's claim in Superior Court that Rosenthal and Constantine Cannon had used Mrs. Copeland as a catspaw to divert the $1.6 million to themselves require a lesser showing of bad faith than would have been needed before Judge Platt. *See Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper,*

---

**17.** He, of course, was in privity with Constantine Cannon as a partner at the firm.

*Chartered,* 935 A.2d 362, 381 (D.C.2007) (attorney may be liable only if he "possess[es] a desire to harm [another] which is independent of the desire to protect his client. This would constitute *actual malice,* and therefore substantiate a tortious interference with contract claim" (citation omitted; emphasis added).[18]

SNR asserts that "at the time the fee dispute in the New York federal court was being litigated, many of the relevant facts surrounding [Rosenthal's] and Constantine's tortious conduct had not yet been developed and were not before Judge Platt" (Br. for SNR at 67), the implication being that these came to light only between the issuance of Judge Platt's award of the $1.6 million in July 2006 and the filing of the counterclaim in March 2007. But Judge Platt was clearly aware of many of the facts SNR later alleged as proof of deception and dishonesty by Rosenthal and Constantine Cannon, including the apparent effort he described "to leave SNR in the dark about the distribution of the [Copeland family] proceeds following the settlement of [New Jersey] probate proceedings." Nor does SNR identify the relevant facts that it had no means of discovering in time to bring to Judge Platt's attention, with or without an extension of the prescribed time. *See* FED. R. CIV. PROC. 54(d)(2)(b) (allowing fourteen days from judgment for submission of attorney fees request unless "court order provides otherwise"). SNR further argues that, for purposes of the wrongful involvement in litigation exception, its failure to seek fees against Rosenthal and Constantine Cannon in New York is immaterial because Mrs. Copeland was also a party to

the proceedings there (with a putative interest herself in reaping a portion of the $1.6 million), but "is a 'third party' to the present action" (Br. for SNR at 66). The Superior Court judge agreed with this point and told the jury that SNR could recover as long as the New York motion practice was, "in part against Mrs. Copeland." But that misreads the second element of the *Safeway Stores* test, which does not require that the prior litigation was *either* with a third party *or* not with the defendant in the present action. Rather, it "ordinarily must have been with a third party *and not* with the defendant in the present action." *Safeway Stores,* 451 A.2d at 69 (emphasis added); *see also Taylor v. Tellez,* 610 A.2d at 255.

SNR has given us no reason to relax this requirement,[19] one obviously designed to prevent the exception for wrongful involvement in litigation from swallowing the American Rule that each party must pay its own attorney. Judge Platt, having just finished the task of weighing the competing claims of SNR and Constantine Cannon for the $1.6 million fees, and expert through experience in deciding when litigation is groundless and should be sanctioned by, for example, a shift in attorney fees, *see* FED. R. CIV. PROC. 11, was well suited to consider the *bona fides* of Constantine Cannon's action in forcing SNR to incur the cost of litigating its right to the contingent fee. Since SNR passed up the opportunity to make Constantine Cannon bear all or some of the costs of that litigation, it is not entitled to a second chance now.

---

**18.** Recognizing this, the counterclaim alleged that "Mr. Rosenthal's and Constantine's actions did not serve the best, or any, interests of the Copelands. Instead, those actions, which put the Copelands into direct breach of their retainer agreement and exposed them to

suit, were intended to serve the interests of Mr. Rosenthal and Constantine."

**19.** We find here no "special circumstance," *Safeway Stores,* 451 A.2d at 69, justifying departure from the general rule.

## IX.

To summarize, we have held that neither SNR's counterclaim nor Rosenthal's claim for damages for the contract years 2003–2004 should have reached the jury, but that the jury's award of compensation Rosenthal should have received for 2005–2006 is supported by the evidence, and he is entitled to that award (minus the compensation he received from SNR and Constantine Cannon for that period) without the erroneous reduction by the earnings Rosenthal would have been due after his retirement from SNR. At the same time, we have held that Rosenthal is entitled to a new trial on compensatory damages for the 2005–2006 period because his proof of those damages was unduly restricted by the trial judge. This leaves us with the apparent anomaly of a disposition that would vacate the damage award in favor of a new trial on that issue when Rosenthal might, after all, prefer to accept the jury's award as correctly reduced. We will excuse his failure to declare himself on this choice in his briefs, since he may not and need not have anticipated the particular constellation of rulings we have made on the issues. In any event, it would be a gross mismanagement of the resources of a busy trial court for us to require it to retry a case on damages if Rosenthal no longer seeks that remedy. In these circumstances, we may properly employ our authority to order a disposition that is "just in the circumstances," D.C.Code § 17–306, namely: As to damages for the years 2005–2006, we will vacate the jury's award and remand for a new trial on damages; but if Rosenthal decides instead to accept the jury's present award (appropriately reduced to account for the compensation he received from SNR and Constantine Cannon for that period), he must notify the trial court in timely fashion of that election, and the court should reinstate the award and make the necessary deductions.

*Affirmed in part and reversed in part; case remanded for further proceedings consistent with this opinion.*